[Cite as *State v. York*, 2022-Ohio-1626.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                    CASE NO. 14-21-14

    v.

CHARLES CALVIN YORK,             O P I N I O N

    DEFENDANT-APPELLANT.

---

**Appeal from Union County Common Pleas Court**
**Trial Court No. 2019-CR-0023**

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

**Date of Decision: May 16, 2022**

---

APPEARANCES:

    *Samuel H. Shamansky* **for Appellant**

    *Raymond Kelly Hamilton* **for Appellee**

**MILLER, J.**

{¶1} Defendant-appellant, Charles York, appeals the May 12, 2021 judgment of sentence of the Union County Court of Common Pleas. For the reasons that follow, we affirm in part and reverse in part.

## I. Background

{¶2} This case arises from York's alleged sexual abuse of two of his step-nieces, M.J. and B.J., between 2010 and 2018. Sexual abuse perpetrated by York against a third step-niece, K.A., also has a bearing on this case.

{¶3} On February 15, 2019, the Union County Grand Jury indicted York on six counts: Count One of rape in violation of R.C. 2907.02(A)(1)(b), a first-degree felony, with a sexually violent predator specification pursuant to R.C. 2941.148(A); Count Two of gross sexual imposition in violation of R.C. 2907.05(A)(4), a third-degree felony; Count Three of rape in violation of R.C. 2907.02(A)(1)(c), a first-degree felony, with a sexually violent predator specification pursuant to R.C. 2941.148(A); and Counts Four through Six of gross sexual imposition in violation of R.C. 2907.05(A)(5), fourth-degree felonies. Counts One through Four were based on acts allegedly perpetrated by York against M.J. Count Five related to acts allegedly perpetrated by York against K.A., and Count Six related to acts allegedly perpetrated by York against B.J. On February 20, 2019, York appeared for arraignment and pleaded not guilty to the counts and specifications of the indictment.

{¶4} On December 10, 2019, York filed a motion to sever the counts of the indictment. York asked that Counts One through Four be tried separately from the remaining counts of the indictment. He additionally requested that Counts Five and Six be tried separately from each other. On January 14, 2020, the trial court denied York's motion to sever.

{¶5} On March 22, 2021, the State moved to dismiss Count Five of the indictment on grounds that Count Five "was satisfied and resolved in Marysville Municipal Court case number 2016CRB590 by the court's finding that [York] was guilty of sexual imposition [against K.A.] in violation of R.C. 2907.06(A)(4), which resulted in [York] being required to register as a 'Tier 1 Sex Offender.'" The trial court granted the State's motion and dismissed Count Five without prejudice. The case then proceeded to a jury trial on the remaining counts and specifications of the indictment.

{¶6} At trial, M.J., who was 20 years old at the time of her testimony, testified that she used to live in a trailer with her sisters, B.J. and K.A., her brother, D.J., her mother, Sheri York ("Sheri"), and her stepfather, Jeff York ("Jeff"). Jeff's brother, the appellant York, also lived in the trailer for a period of time. M.J. testified that York sexually assaulted her a number of times while he was residing with the family. She testified that York "put his penis into [her] vagina" and touched her "private parts" including her "breast[s], buttocks, * * * thighs, or that place between [her] legs"

-3-

when she was under the age of 13. (Mar. 23, 2021 Tr., Vol. II, at 10). M.J. stated that York also assaulted her in a similar fashion when she was over the age of 13. (Mar. 23, 2021 Tr., Vol. II, at 10). M.J. testified that, on each occasion, York assaulted her inside of the family's trailer. (Mar. 23, 2021 Tr., Vol. II, at 10).

{¶7} M.J. went on to describe in detail instances of York's abuse. M.J. testified that, when she was younger, she used to sleep on the couch because she did not have a bed at the time. She stated that York would come into the living room "saying he wanted to watch television" and sit on the same couch she was sleeping on. (Mar. 23, 2021 Tr., Vol. II, at 14). M.J. testified that she "would wake up to [York] rubbing [her] thigh and * * * over a period of time, [she] would start sleeping on just one cushion of the couch and he would make an excuse to sit in the middle of the couch." (Mar. 23, 2021 Tr., Vol. II, at 14). According to M.J., she eventually "started sleeping on the floor in [her] room to get away" from York. (Mar. 23, 2021 Tr., Vol. II, at 14).

{¶8} M.J. also testified about alarming or uncomfortable comments York made to her. She testified that she enjoyed wearing dresses when she was younger, but that York told her that she "looked really nice in dresses" and that "if [she] wasn't his niece, * * * he would try to get with her." (Mar. 23, 2021 Tr., Vol. II, at 14). She said that York would call her "sexy," "whore," or "worthless." (Mar. 23, 2021 Tr., Vol. II, at 15). M.J. stated that York also threatened to "go after" K.A. if she told

anyone about the abuse. (Mar. 23, 2021 Tr., Vol. II, at 14). Further, M.J. testified that York said she would "probably end up dead" if she told anyone. (Mar. 23, 2021 Tr., Vol. II, at 26).

{¶9} In addition to M.J.'s testimony, the State presented a video recording of statements M.J. made during a March 30, 2018 forensic interview at the Child Advocacy Center ("CAC") in Columbus. (State's Ex. 3). During the interview, M.J. described incidents of sexual abuse perpetrated by York. M.J. first described an incident very similar to the one she testified to at trial:

> One day I woke up. Not fully, but I woke up, and [York] was sitting at the edge of the couch, rubbing my legs. So from then on I decided to curl up a little more so I only took up two cushions instead of three, and he just kept moving over and rubbing my legs every single time I woke up, until the point that I ended up being able to sleep on one of the cushions. And he tried any excuses to sit in the middle of the couch.

She stated that York rubbed her knee and thigh and that he said that he was trying to comfort her or help her sleep. M.J. said that she asked York to stop but that he did not listen.

{¶10} M.J. also described two additional incidents—one when she was approximately 12 years old and one when she was approximately 15 years old. M.J. stated that, during the first of these incidents, she went to bed and woke up to York kissing her on her cheek. She stated that York got on top of her, pulled down his boxer shorts, and said, "It will be okay." M.J. said that she felt like she "couldn't move any muscles." M.J. stated that she did not see York's penis, but that she

-5-

believed that his penis penetrated her vagina because his hands were positioned next to her head like he was "lifting himself up a little" and his hips were aligned with her hips. She then said that she felt his penis enter her vagina and that she now knows it was his penis because she has since had consensual sexual intercourse. M.J. stated that she felt pain in her vagina, that her vagina bled after the incident, and that it later hurt to urinate.

{¶11} As to the later incident, M.J. stated that around Christmastime, she decided to cook a turkey for the family. After preparing the turkey, she laid down on the couch to rest. M.J. said that she thought she could lie down because York was absent from the trailer. According to M.J., she was lying on the couch sleeping when she woke up to York "pulling up his shorts and getting off of [her]." M.J. said that by York's "shorts" she meant his boxer shorts. She stated that York was "laying on top of [her]" and that she woke up because "it was hard to breathe because he was putting all his weight on [her]." M.J. said that her underwear was pulled down around her ankles and that she "felt sore down there," meaning her vagina. She emphasized that when she awoke, she felt "a lot of pain" in the area of her vagina. M.J. stated that she was only able to view York's buttocks "because he turned away from [her]."

{¶12} B.J., who was 24 years old at the time of her testimony, also testified at trial. B.J. stated that when she was 15 or 16 years old, she and York were in the family's trailer watching television on the couch when York put "his hand on [her]

knee and start[ed] moving it up a little bit" toward her vagina. (Mar. 23, 2021 Tr., Vol. II, at 111, 113-114). She stated that she "slapped his hand and told him no." (Mar. 23, 2021 Tr., Vol. II, at 111). B.J. testified that York stopped after she slapped his hand a couple of times and that she then ran to tell Sheri and Jeff about what had happened. (Mar. 23, 2021 Tr., Vol. II, at 114).

{¶13} B.J. testified that the very first time York touched her inappropriately she was staying at the home of one of York's friends along with York and her siblings. B.J. stated that York "turned over towards [her] in the bed and put his hand up on [the] higher side of [her] thigh" and moved toward her vagina. (Mar. 23, 2021 Tr., Vol. II, at 112, 117). She testified that she told York "no, stop it" and "rolled away from him up against the wall." (Mar. 23, 2021 Tr., Vol. II, at 112). According to B.J., she also slapped his hand "real hard" and told him that what he was doing was not right. (Mar. 23, 2021 Tr., Vol. II, at 117). B.J. stated that she was 13 or 14 years old at the time of this incident. (Mar. 23, 2021 Tr., Vol. II, at 116).

{¶14} B.J. described a third incident with York as follows:

[W]e were at [the trailer]. * * * I went to the bedroom to go get my bedding and all that to go to sleep in the parents' room and, as I went back there, [York] came to the bedroom and stood in front of the door and I went to go to the bed and he came in and trapped me on the bed. He sat down, grabbed me, put me on his lap and started rubbing my butt. And then I was fighting him and I ran away and was bawling into my parents' room.

(Mar. 23, 2021 Tr., Vol. II, at 112).

{¶15} Finally, B.J. described an incident where she was playing a card game in the living room with York. B.J. testified that she was wearing a shorter skirt and had her legs crossed. She stated that York put his hand between her thighs and began moving his hand toward her vagina. (Mar. 23, 2021 Tr., Vol. II, at 118). B.J. testified that, like the other incidents, she slapped York's hand away and then ran to tell Sheri and Jeff what had happened. (Mar. 23, 2021 Tr., Vol. II, at 118). Like M.J., B.J. testified to a number of inappropriate sexual comments made by York, including that he had been "single for so long" and that he did not "get the affection that he needs." (Mar. 23, 2021 Tr., Vol. II, at 119).

{¶16} Although Count Five of the indictment had been dismissed, the State also called K.A. to testify regarding her experience with York. K.A., who was 18 years old at the time of trial, testified that on September 22, 2016, when she was 14, she was with York in the family's trailer. K.A. and York were watching television, and K.A. stated that she was wearing "booty shorts"—"really, really short" shorts that "can show the bottom of your butt." (Mar. 23, 2021 Tr., Vol. I, at 60-61). K.A. said she felt uncomfortable because she "could feel [York's] eyes on her." (Mar. 23, 2021 Tr., Vol. I, at 59). She said York suggested that she change into a dress because she "look[ed] good in dresses just as well as [her] sister does." (Mar. 23, 2021 Tr., Vol. I, at 59). K.A. testified that she did not want to put on the dress because it was too

revealing. She said she became so uncomfortable that she went into Sheri's bedroom to lie in the bed. (Mar. 23, 2021 Tr., Vol. I, at 59-60).

{¶17} According to K.A., she was lying in bed when York "threw the blanket off of [her]" and began grabbing her buttocks, kissing her on the cheek and neck, and rubbing his hands over her thighs. (Mar. 23, 2021 Tr., Vol. I, at 53). K.A. testified that she pushed York and kicked him in the groin to get him off of her. (Mar. 23, 2021 Tr., Vol. I, at 54, 67). K.A. stated that she was able to get away from York and that she ran to her maternal grandfather's house, where she called her cousin. (Mar. 23, 2021 Tr., Vol. I, at 54). Her cousin then came over and called the police. (Mar. 23, 2021 Tr., Vol. I, at 54). In addition, K.A. confirmed that York was known to make numerous inappropriate comments, including "unsettling" comments about how pretty M.J. looked in dresses. (Mar. 23, 2021 Tr., Vol. I, at 74-75).

{¶18} Following K.A.'s testimony, the State introduced a copy of a video recording of York's interview with police after he was arrested on September 22, 2016. During the interview, York admitted that he took the blanket off of K.A., grabbed her buttocks, and kissed her on her neck and thigh. (State's Ex. 15). He seemingly acknowledged that K.A. had struggled to get away from him, and he said he ultimately let K.A. go when he "realized [he] was in the wrong." (State's Ex. 15). York explained that he "just wasn't thinking straight," and he claimed that he was "seduced" by K.A. He stated that K.A., as well as M.J. and B.J., had been "play[ing]

games" with him by "taunting and teasing" him and "sitting there in their shorts with their legs up so you can see shit." (State's Ex. 15). When asked whether "this [went] on a lot," York responded that he had "been lonely for 10 years." (State's Ex. 15). York also told the interviewing officer that he had tried to "teach them and tell them" to cross their legs and wear less revealing clothing. (State's Ex. 15). York further said that he had in the past commented that M.J. looked "nice" and "pretty today" in her dresses. (State's Ex. 15).

{¶19} The State then presented a certified copy of York's sentencing entry in Marysville Municipal Court case number 2016CRB590. (State's Ex. 16). The sentencing entry reflected that York had pleaded no contest to one count of third-degree misdemeanor sexual imposition. (State's Ex. 16). Furthermore, the entry reflected that York was designated as a Tier I Sex Offender and ordered to have no contact with K.A. (State's Ex. 16).

{¶20} York's defense centered primarily on discrediting M.J.'s and B.J.'s testimonies while simultaneously attempting to demonstrate that it was M.J. and B.J.'s maternal grandfather who actually abused them. Sheri and Jeff both testified that M.J. and B.J. had a history of misbehavior and dishonesty. Jeff testified that he was skeptical about M.J.'s and B.J.'s claims because their stories kept changing and because they were not behaving as though they had been assaulted in the manner they described. (Mar. 24, 2021 Tr., Vol. I, at 46, 78-80, 87-88). Jeff also testified that B.J.

had previously falsely accused someone of sexual abuse. (Mar. 24, 2021 Tr., Vol. I, at 88). Sheri in turn testified that B.J.'s account of the abuse perpetrated by York kept changing, much like her earlier, allegedly false accusation. (Mar. 24, 2021 Tr., Vol. I, at 108-109, 135). Sheri stated that M.J.'s story had likewise changed over time. (Mar. 24, 2021 Tr., Vol. I, at 135). She testified that M.J. and B.J. both had a history of "not being truthful." (Mar. 24, 2021 Tr., Vol. I, at 128, 130). Sheri stated that she does not believe that York "sexually touched" M.J. or B.J. (Mar. 24, 2021 Tr., Vol. I, at 134). Similarly, M.J. and B.J.'s brother, D.J., testified that he did not believe M.J.'s and B.J.'s allegations, partly because they had a reputation in the family for being liars. (Mar. 25, 2021 Tr. at 41-42). He also claimed that M.J. and B.J. always tried to "manipulate" him into doing things for him by "spreading their legs open and trying to say that [he was] going to do this or [they were] going to tell dad that [he] did this." (Mar. 25, 2021 Tr. at 42).

{¶21} With respect to his claim that the actual abuser was M.J. and B.J.'s maternal grandfather, York offered the testimony of Courtney Simpson. Simpson testified that she briefly worked with M.J. at a McDonald's restaurant. Simpson stated that during one shift, she encountered M.J. in the crew room, where M.J. disclosed that "her mom forced her to take and lie on [York] and say that [York] molested her and sexually messed with her." (Mar. 25, 2021 Tr. at 8). She testified that M.J. then said that York "didn't do it and it was her grandfather that did it." (Mar. 25, 2021 Tr.

at 8). In addition to Simpson, Jeff testified that M.J. and B.J. had previously alleged to him and to others that their grandfather abused them and that he believed these claims because Sheri had disclosed to him that she had been abused by her father. (Mar. 24, 2021 Tr., Vol. I, at 80-82, 87-89). Sheri stated that she had been abused by her father, and she further testified that she was under the impression that M.J. had actually told York that she was being abused by her grandfather. (Mar. 24, 2021 Tr., Vol. I, at 125-26, 131).

{¶22} For their part, M.J. and B.J. repeatedly denied that they had been abused by their grandfather. They insisted that it was York who abused them. Furthermore, M.J. and B.J. testified that it was Sheri and Jeff, not them, who were being untruthful. Finally, M.J. flatly rejected Simpson's story and urged that Simpson was lying.

{¶23} On March 25, 2021, the jury found York guilty of Counts One through Four and Count Six. York waived his right to a jury for determination of the sexually violent predator specifications associated with Counts One and Three. The trial court later held a hearing on the specifications, after which the trial court concluded that "it could not find beyond a reasonable doubt that [York] was likely to commit future sexually violent crimes."

{¶24} The case then proceeded to sentencing. At the May 12, 2021 sentencing hearing, the trial court sentenced York to 10 years to life in prison for Count One, 36 months in prison for Count Two, 8 years in prison for Count Three, 15 months in

prison for Count Four, and 15 months in prison for Count Six. The trial court ordered

that the sentences be served consecutively for an aggregate sentence of 23.5 years to

life in prison. Furthermore, York was classified as a Tier III sex offender. The trial

court filed its judgment entry of sentence on May 12, 2021.

## II. Assignments of Error

{¶25} On June 11, 2021, York timely filed a notice of appeal. He raises the

following six assignments of error for our review:

> **1.    Appellant's convictions for Gross Sexual Imposition as to Counts Four and Six are void as a matter of law for lack of subject matter jurisdiction.**
>
> **2.    Appellant was convicted in the absence of evidence sufficient to support findings of guilty as to Counts Three, Four and Six, in violation of his right to due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.**
>
> **3.    Appellant's convictions were against the manifest weight of the evidence in violation of his right to due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.**
>
> **4.    The trial court erred by allowing a joint trial of all offenses set forth in the Indictment despite a significant risk of confusing the jury in violation of his rights as guaranteed by the Fifth and Sixth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.**
>
> **5.    The trial court erred by allowing the State to elicit "other acts" evidence that was not admissible for any permissible purpose under Evid.R. 404(B) and which was affirmatively utilized by the State to prove Appellant's action in conformity therewith.**

**6.  Trial counsel's failure to seek dismissal of Counts Four and Six and repeated failure to object to irrelevant, inadmissible, and highly prejudicial testimony constituted ineffective assistance of counsel and violated Appellant's rights as guaranteed by the Sixth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution.**

For ease of discussion, we elect to address the assignments of error out of the order they were presented.

### III. Discussion

**A.  Fourth Assignment of Error:  Did the trial court commit plain error by allowing all of the counts to be tried in a single trial?**

{¶26} In his fourth assignment of error, York argues that the trial court committed plain error by allowing Counts One through Four of the indictment, which related to the offenses allegedly committed by York against M.J., to be tried alongside Count Six of the indictment, which related to the offense allegedly committed by York against B.J.  York notes that "each of the alleged offenses involved one of two sisters who alleged that [he] engaged in similar sexually inappropriate behavior in the same residence during a similar period of time."  York argues that he was prejudiced by the joinder of these offenses for trial because the jury was permitted to "compare these numerous and substantial similarities and form inferences based on [his] perceived propensity, rather than separate and independent proof."

**i. Standard of Review**

{¶27} "Joinder is liberally permitted to conserve judicial resources, reduce the chance of incongruous results in successive trials, and diminish inconvenience to the witnesses." *State v. Schaim*, 65 Ohio St.3d 51, 58 (1992). However, even where joinder is otherwise proper under Crim.R. 8(A), "[i]f it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, * * * the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires." Crim.R. 14.

{¶28} "Generally, we review a trial court's decision on a motion to sever under Crim.R. 14 for an abuse of discretion." *State v. Lester*, 3d Dist. Union Nos. 14-18-21 and 14-18-22, 2020-Ohio-2988, ¶ 31. However, in this case, because York did not renew his Crim.R. 14 motion for severance at the close of the State's case or at the close of all evidence, our review is limited to whether the trial court committed plain error. *Id.* at ¶ 32.

{¶29} To reverse a criminal conviction on the basis of plain error, the trial court must have deviated from a legal rule, the error must have been an obvious defect in the proceeding, and the error must have affected a substantial right. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Under the plain-error standard, the appellant must demonstrate that the outcome of his trial would clearly have been different but for the trial court's errors. *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996), citing *State v.*

*Moreland*, 50 Ohio St.3d 58 (1990). We recognize plain error "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Landrum*, 53 Ohio St.3d 107, 111 (1990), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

**ii. The trial court did not commit plain error by conducting a single trial.**

**{¶30}** York does not dispute that Counts One, Two, Three, Four, and Six satisfy the requirements for joinder under Crim.R. 8(A). Instead, York maintains that regardless of whether the initial joinder of the offenses was permissible, the combined trial of the offenses was unduly prejudicial.

**{¶31}** To obtain severance pursuant to Crim.R. 14, the *accused* bears "the burden of affirmatively showing that his rights were prejudiced; he must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial[.]" *State v. Torres*, 66 Ohio St.2d 340 (1981), syllabus. However, the State can refute a defendant's claim of prejudicial joinder by demonstrating either of the following: (1) that the evidence to be introduced relative to one offense would be admissible in the trial on the other, severed offense, pursuant to Evid.R. 404(B) (the "other-acts" test); or (2) that, regardless of the admissibility of such evidence, the evidence relating to each charge is simple and direct (the "joinder test"). *State v. Powell*, 8th Dist. Cuyahoga No. 107276, 2019-Ohio-4345, ¶ 74. Importantly, the two tests are disjunctive—the

satisfaction of one negates an accused's claim of prejudice *without consideration of the other*. *State v. Truss*, 10th Dist. Franklin No. 18AP-147, 2019-Ohio-3579, ¶ 17. Thus, "[i]f the state can meet the joinder test, it need not meet the stricter 'other acts' test." *State v. Johnson*, 88 Ohio St.3d 95, 109 (2000).

{¶32} Generally, "[e]vidence meets the simple-and-direct standard [of the joinder test] if it is straightforward and uncomplicated enough that the jury can segregate the proof required for each offense." *State v. Parham*, 10th Dist. Franklin No. 16AP-826, 2019-Ohio-358, ¶ 27, citing *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, ¶ 52. "Ohio appellate courts routinely find no prejudicial joinder where the evidence is presented in an orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof." *State v. Lewis*, 6th Dist. Lucas Nos. L-09-1224 and L-09-1225, 2010-Ohio-4202, ¶ 33.

{¶33} Here, M.J. and B.J. are sisters who were allegedly assaulted by York at the same location during roughly the same time period. Thus, insofar as the State sought to provide background information and contextualize York's alleged abuse, there was necessarily some evidentiary overlap. Nevertheless, M.J. was the only witness to the abuse allegedly perpetrated against her by York. Likewise, B.J. was the only witness to the crime allegedly perpetrated against her. When M.J. testified about what York had allegedly done to her and the State introduced M.J.'s other statements, specifically the CAC video recording, there was no risk that the jury

would misunderstand M.J.'s account and conclude that she was describing anything other than the acts York perpetrated against her. The same is true of B.J.'s testimony. Therefore, the evidence was sufficiently straightforward and uncomplicated that the jury could readily segregate the proof required for each offense. Indeed, in sexual-assault cases with allegations similar to those in this case, courts have determined that the evidence of each case was separate and distinct. *See State v. Addison*, 12th Dist. Clermont Nos. CA2019-07-058 and CA2019-07-059, 2020-Ohio-3500, ¶ 53; *State v. Woodruff*, 1st Dist. Hamilton Nos. C-140256 and C-140257, 2015-Ohio-2422, ¶ 15.

{¶34} Furthermore, there is no indication in the record that York would have pursued a different defense against the charges had they been tried separately. *See State v. Ashcraft*, 12th Dist. Butler No. CA2008-12-305, 2009-Ohio-5281, ¶ 25. At trial, York defended against the charges by suggesting that M.J. and B.J. had either misidentified their assailant or outright fabricated their allegations of abuse. However, there is nothing in the record suggesting that York was forced to pursue this defense because the charges against him were tried together or that some other defense was made unavailable to him by reason of the joint trial.

{¶35} Finally, after the close of evidence, the trial court instructed the jury as follows: "The charges set forth in each count in the indictment constitute a separate and distinct matter. You will consider each count and the evidence applicable to each count separately, and you must state your findings as to each count uninfluenced by

your verdict as to any other count." "Courts have held that any prejudice that results from the joinder of offenses is minimized when a trial court cautions a jury before deliberations to consider each count, and the evidence applicable to each count separately, and to state its findings as to each count uninfluenced by its verdict on any other counts." *State v. Freeland*, 4th Dist. Ross No. 12CA3352, 2015-Ohio-3410, ¶ 16. For all of these reasons, we conclude that the trial court did not commit plain error by allowing these charges to be tried together.

{¶36} York's fourth assignment of error is overruled.

**B. Fifth Assignment of Error: Did the trial court err by allowing the State to introduce inadmissible "other-acts" evidence in violation of Evid.R. 404(B)?**

{¶37} In his fifth assignment of error, York argues that the trial court erred by allowing the State to introduce certain "other-acts" evidence at trial. York focuses on three items of supposedly inadmissible other-acts evidence: (1) evidence "concerning his sexual offenses against K.A."; (2) testimony regarding "alleged drug use and drug sales"; and (3) testimony about "a purported suicide attempt."

**i. Applicable Law & Standard of Review**

{¶38} "Evid.R. 404(B) categorically prohibits evidence of a defendant's other acts when its only value is to show that the defendant has the character or propensity to commit a crime." *State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, ¶ 36. "[E]vidence which tends to show that the accused has committed other crimes or acts independent of the crime for which he stands trial is not admissible to prove a

defendant's character or that the defendant acted in conformity therewith." *State v. Hawthorne*, 7th Dist. Columbiana No. 04 CO 56, 2005-Ohio-6779, ¶ 24. "However, under Evid.R. 404(B), 'the admission of "other acts" extrinsic to the charged offense' is permissible in certain circumstances." *State v. Bortree*, 3d Dist. Logan No. 8-20-67, 2021-Ohio-2873, ¶ 44, quoting *Lester*, 2020-Ohio-2988, at ¶ 43.

**{¶39}** When determining whether other-acts evidence is admissible, courts engage in a three-step analysis. *See State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, ¶ 19-24. First, the court "consider[s] whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Id.* at ¶ 20, citing Evid.R. 401. "The threshold question is whether the evidence is relevant." *Smith* at ¶ 37. However,

> the problem with other-acts evidence is rarely that it is irrelevant; often, it is too relevant. In the Evid.R. 404(B) context, the relevance examination asks whether the proffered evidence is relevant to the particular purpose for which it is offered, as well as whether it is relevant to an issue that is actually in dispute.

(Citations omitted.) *Id.*; *see State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, ¶ 26 ("[T]he inquiry is not whether the other-acts evidence is relevant to the ultimate determination of guilt. Rather, the court must evaluate whether the evidence is relevant *to the particular purpose* for which it is offered.") (Emphasis sic.). "Thus,

courts should begin by evaluating whether the evidence is relevant to a non-character-based issue that is material to the case." *Smith* at ¶ 38.

**{¶40}** In the second step, the court "consider[s] whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)." *Williams* at ¶ 20. Under Evid.R. 404(B), other-acts evidence may be admissible to establish "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B)'s list of permissible uses for other-acts evidence is nonexhaustive. *Hartman* at ¶ 26. The key to the admissibility of other-acts evidence under Evid.R. 404(B) is that "the evidence must prove something other than the defendant's disposition to commit certain acts." *Id.* at ¶ 22.

**{¶41}** In the third and final step, the court "consider[s] whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice." *Williams* at ¶ 20, citing Evid.R. 403. "As the importance of the factual dispute for which the evidence is offered to the resolution of the case increases, the probative value of the evidence also increases and the risk of *unfair* prejudice decreases." (Emphasis sic.) *Hartman* at ¶ 31.

**{¶42}** The first two steps of the foregoing analysis "present questions of law and are subject to a de novo standard of review on appeal." *Bortree*, 2021-Ohio-2873,

at ¶ 46. However, the "third step 'constitutes a judgment call which we review for abuse of discretion.'" *Id.* at ¶ 48, quoting *State v. McDaniel*, 1st Dist. Hamilton No. C-190476, 2021-Ohio-724, ¶ 17. An abuse of discretion is more than a mere error in judgment; it suggests that a decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157-158 (1980).

**{¶43}** Finally, we note that York did not object to the admission of all of the other-acts evidence that is the subject of this assignment of error. With respect to the evidence to which York did not object, we are limited to plain-error review. *State v. Wendel*, 3d Dist. Union No. 14-16-08, 2016-Ohio-7915, ¶ 23.

**ii. The trial court did not err by allowing the State to introduce other-acts evidence.**

**{¶44}** York contends that three different categories of impermissible other-acts evidence were improperly admitted as evidence at his trial. We address each category in turn.

**a. The evidence regarding York's offense against K.A. was properly admitted to rebut York's claims of innocent intent.**

**{¶45}** Evidence of York's prior offense against K.A. was introduced at trial primarily through three channels: (1) K.A.'s testimony, (2) the video recording of York's interrogation, and (3) the certified copy of York's sentencing entry in Marysville Municipal Court case number 2016CRB590. In its pre-trial notice of intent to use Evid.R. 404(B) evidence, the State indicated that this evidence would be

-22-

relevant to demonstrating "absence of mistake or accident," as well as the "signature marks of [York's] motive, opportunity, identity, intent and plan" and his "modus operandi." Similarly, in its appellate brief, the State maintains that the trial court did not err by admitting this evidence because it "create[d] probative evidentiary value related to the specific provisions of Evidence Rule 404(B) associated with * * * opportunity, identity, intent and plan." The State also asserts that this evidence "provided probative signature marks of [York's] motive—sexual gratification." While we have our doubts whether the evidence of York's prior offense against K.A. was admissible for all of these purposes, the State identified at least one permissible purpose for this evidence.

{¶46} As mentioned above, York's defense was premised mainly on discrediting M.J. and B.J. and shifting blame for their abuse onto their maternal grandfather. However, in at least one instance, York attempted to inject the possibility of an innocent explanation for some of his alleged conduct. While cross-examining B.J., York's trial counsel inquired whether B.J. was incorrectly recalling one of the incidents with York and whether she had in fact told Jeff that York "just pulled the covers off of [her]." (Mar. 23, 2021 Tr., Vol. I, at 141). B.J. responded that "no, [she] did not tell Jeff anything about telling that [York] didn't do it." (Mar. 23, 2021 Tr., Vol. I, at 141).

{¶47} York's trial counsel resumed this line of inquiry while cross-examining

Jeff:

[York's Counsel]:    Okay, there was a specific instance with [B.J.] where she came, I believe --

[Jeff]:    Into my room.

[York's Counsel]:    -- into your bedroom when Sheri was there, also. Correct?

[Jeff]:    Yes.

[York's Counsel]:    And she indicated that something had happened. Correct?

[Jeff]:    Yeah, that [York] pulled the covers off of her and touched her leg when he ripped them back asking where his cigarettes was at [sic].

[York's Counsel]:    Did she say anything else had happened?

[Jeff]:    No, she said that it made her feel uncomfortable that he was in the room and that's why I got mad because he was in the room and I didn't think it was right of him being in the room while she was asleep. * * *

[York's Counsel]:    So, you did believe that he may have pulled the covers off?

[Jeff]:    Yeah.

[York's Counsel]:    And in the process, actually, touched her leg at some point?

[Jeff]:    Yep.

[York's Counsel]:    In a sexual manner?

[Jeff]:             No, just trying to get the covers off from what she told me because I was starting to get pissed and when I start getting mad, she's like he didn't do nothing [sic]. He just scared me. I was like, well, you need to disclose this before you get me up out of bed out of a dead sleep.

(Mar. 24, 2021 Tr., Vol. I, at 76-78). Sheri similarly testified on cross-examination that B.J. "just said that [York] pulled the blanket off of her" and that he "touched her leg or something when he pulled the cover off of her." (Mar. 24, 2021 Tr., Vol. I, at 127-128).

{¶48} Finally, during closing statements, York's trial counsel specifically emphasized this alternative version of this incident between B.J. and York:

I'm going to talk to you next about [B.J.]. The testimony that you heard about [B.J.] is that she indicated that there were three separate events that occurred with [York]. She also testified that she didn't tell anybody until the final event. I believe she was fifteen or sixteen. And the testimony there was that she ran to her mother and stepfather's bedroom. But you also heard testimony that the reason why [York] had chased her was that she had stolen some cigarettes. She had them in the bed. And what [B.J.] indicated was, and Sheri and Jeff both corroborated, was that the actual acts were that [York] had pulled the covers off trying to get the cigarettes from [B.J.]. That's when she took off. And [B.J.] said, he may have touched me on the leg. She never said he did anything sexual in nature at that point. * * * There is no evidence whatsoever that any of [the incidents] happened, except on the last event where it's been set forth that * * * York was in her room, pulled off the covers. You heard the explanation. He was trying to get his cigarettes back, which she had stolen. And then when she ran to her room, she made the utterance that he had pulled the covers off. And she admitted that, well, maybe he touched my leg. Nothing of any sexual nature at that point. You heard both Sheri and Jeff testify that they didn't believe that [York] had done anything of a sexual nature to [B.J.].

-25-

(Mar. 25, 2021 Tr. at 100-101).

**{¶49}** Through cross-examination and his argumentation during closing statements, York placed his intent at issue. That is, York effectively conceded that he might have touched B.J.'s leg during one of the several incidents B.J. described during her testimony, but he claimed that such touching was, at most, incidental to his pulling off the covers. Thus, a material issue at trial was whether York had in fact touched B.J. during this particular incident, and if so, whether the touching was done for the purpose of sexual gratification as required to prove gross sexual imposition.

**{¶50}** To be probative of intent, rather than the defendant's propensity to commit similar crimes, the other-acts evidence "must be sufficiently similar to the crime charged." *Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, at ¶ 45. "[T]he question is whether, '*under the circumstances, the detailed facts* of the charged [offense] and [the other acts] strongly suggest that an innocent explanation is implausible.'" (Emphasis sic.) *Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, at ¶ 58, quoting Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events*, Section 7.5.2 (2d Ed.2019). "[T]he other-acts evidence 'must be so related to the crime charged in time or circumstances that evidence of the other acts is significantly useful in showing the defendant's intent in connection with the crime charged.'" *Id.*, quoting 1 *Wharton's Criminal Evidence*, Section 4:31 (15th Ed.2019).

{¶51} Here, the State's evidence of York's prior offense against K.A. satisfies the first two steps of the other-acts evidence analysis because (1) York's intent in touching B.J. was both in dispute and material to the outcome of the case; (2) the other-acts evidence was relevant to determining whether York's intent was malicious or whether it was benign; and (3) the evidence was presented for a legitimate purpose under Evid.R. 404(B), rather than to prove York's character and propensity to commit sexual crimes. The incident described by K.A. in her testimony—the details of which were confirmed by York's own statements during his interview with police and by his subsequent no-contest plea—bears a substantial resemblance to one of the incidents described by B.J. during her testimony. In both incidents, York cornered one of his step-nieces in a bedroom in the family trailer. The girls were similarly aged at the time of each incident. Furthermore, K.A. and B.J. were both attacked by York while they were in bed, York touched both of them on their buttocks, and in both instances, K.A. and B.J. had to fight to escape from York. The incident with K.A. was even similar to York's own version of the encounter with B.J. insofar as they both involved York tearing a blanket away from one of his step-nieces. In sum, the detailed facts of York's attacks on both K.A. and B.J., including his relationship to K.A. and B.J., their ages, the location and environment in which the abuse occurred, and the manner of the abuse, were sufficiently similar to suggest that an innocent explanation is

implausible. *See Smith* at ¶ 49. The State's evidence of York's prior offense against K.A. makes it more likely that York touched B.J.'s body with sexual intent.

**{¶52}** With respect to step three, it does not appear from the record that the trial court explicitly stated its findings regarding its application of Evid.R. 403(A)'s balancing test. However, the Supreme Court of Ohio has stated that "Evid.R. 403(A) establishes a standard but does not require a trial court to explicitly state in its judgment entry that the probative value of the 'other acts' evidence outweighs its prejudicial impact." *State v. Bey*, 85 Ohio St.3d 487, 489 (1999). "Absent a demonstration in the record that the trial court did not do so, it is presumed that a trial court has followed and applied Evid.R. 403 in the admission or exclusion of evidence." *State v. McCown*, 10th Dist. Franklin No. 06AP-153, 2006-Ohio-6040, ¶ 21. Because there is no indication in the record that the trial court did not follow and apply Evid.R. 403, we presume that it did.

**{¶53}** Presuming that the trial court found that the probative value of the State's evidence of York's prior offense against K.A. was not substantially outweighed by the danger of unfair prejudice, we conclude that the trial court did not abuse its discretion. To resolve this case, it was critically important to determine what York intended when he touched B.J. The probative value of the other-acts evidence being fairly high in this case, the risk of unfair prejudice decreased by a proportional amount. *See Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, at ¶ 31. Furthermore,

-28-

the danger of undue prejudice was mitigated at least somewhat by the trial court's admonishments to the jury throughout trial that it could not consider the State's other-acts evidence as proof of York's character or propensity to commit crimes. *See Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, at ¶ 24; *Wendel*, 2016-Ohio-7915, at ¶ 24, 27-28. Although the trial court's final instruction to the jury, in which it listed all of the enumerated purposes in Evid.R. 404(B) for which other-acts evidence can be considered, may have been of limited value to the jury, we cannot say that it amplified the risk of unfair prejudice. *See Hartman* at ¶ 68-72; *Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, at ¶ 51. Accordingly, we conclude that the trial court did not err by allowing the State to introduce the evidence of York's prior offense against K.A.

**b. The trial court did not commit plain error by allowing the State to elicit testimony about York's alleged drug use, drug sales, and suicide attempt.**

{¶54} York also argues that the trial court erred by allowing the State to introduce testimony about his alleged drug use, drug sales, and suicide attempt. York did not object to this testimony at trial, so we review for plain error.

{¶55} At trial, a number of the State's witnesses testified about drug use in the family trailer. B.J. testified that York, Sheri, and Jeff used drugs, including crack cocaine, marijuana, and prescription drugs, together in the trailer. (Mar. 23, 2021 Tr., Vol. I, at 130). She testified that York was the one who procured most of the drugs for Sheri, that Sheri was dependent on York for her drugs, and that Sheri had little

history with drugs before meeting York and Jeff. (Mar. 23, 2021 Tr., Vol. I, at 145-147). M.J. similarly stated that there was drug use inside of the trailer and that York would obtain crack cocaine. (Mar. 23, 2021 Tr., Vol. II, at 29). M.J. testified that York had significant influence over Sheri, in part because "[h]e was the one selling her drugs." (Mar. 23, 2021 Tr., Vol. II, at 51). K.A. also testified that York obtained drugs for Sheri and Jeff. (Mar. 23, 2021 Tr., Vol. I, at 95). For their part, Sheri and Jeff admitted that they, as well as York, had used drugs. Sheri conceded that, for a period of time, York obtained crack cocaine for her. (Mar. 24, 2021 Tr., Vol. I, at 117-118).

{¶56} In this case, proof of York's alleged involvement in selling and using drugs was essential to understand the circumstances surrounding York's alleged abuse. For example, the drug abuse in the home provided the jury with a full understanding of how the crimes could be perpetrated against the girls and explained why the abuse went on for as long as it did. It was the State's position that the years-long abuse of M.J. and B.J. was possible because York was supplying Sheri and Jeff with drugs. That is, the State asserted that Sheri and Jeff knowingly turned a blind eye to York's abuse because intervening would have risked disrupting access to their supply of drugs. According to the State, York exploited this situation to his advantage to continue assaulting M.J. and B.J.

**{¶57}** Evid.R. 404(B) "does not bar evidence which is intrinsic to the crime being tried." *State v. Ash*, 7th Dist. Monroe No. 16 MO 0002, 2018-Ohio-1139, ¶ 60. "So-called 'other acts' are admissible if 'they are so blended or connected with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged.'" *Id.*, quoting *State v. Roe*, 41 Ohio St.3d 18, 23-24 (1989). "Consequently, a court can admit evidence of other acts which form the immediate background of and which are inextricably related to an act which forms the foundation of the charged offense." *Id.*

**{¶58}** Here, evidence of York's potential involvement in selling and using drugs in the family trailer was "inextricably related" to the charged offenses in that this evidence explained the circumstances of M.J.'s and B.J.'s abuse. Consequently, it was not error, let alone plain error, for the trial court to allow the State to introduce this evidence.

**{¶59}** Finally, with respect to the various allusions to York's purported suicide attempt, we do not find that the trial court plainly erred by allowing this testimony. York's supposed suicide attempt was referenced briefly only a handful of times throughout trial. Even assuming that it was error for the trial court to allow testimony on this topic, York has failed to demonstrate how the outcome of his trial would have been different had these scattered references been placed beyond the jury's

consideration. In light of the significant testimony and other evidence against York, we cannot conclude that York was prejudiced.

{¶60} York's fifth assignment of error is overruled.

## C. Second Assignment of Error: Are York's convictions on Counts Three, Four, and Six supported by sufficient evidence?

{¶61} In his second assignment of error, York argues that insufficient evidence supports his convictions on Count Three (rape of M.J. in violation of R.C. 2907.02(A)(1)(c)), Count Four (gross sexual imposition against M.J. in violation of R.C. 2907.05(A)(5)), and Count Six (gross sexual imposition against B.J. in violation of R.C. 2907.05(A)(5)). Specifically, York maintains that the State failed to prove that M.J. and B.J. were substantially impaired by a mental or physical condition or advanced age at the time he allegedly assaulted them.

## i. Standard of Review

{¶62} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the

crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33.

**ii. York's Offenses**

{¶63} York was convicted of violating R.C. 2907.02, which defines the offense of rape, and R.C. 2907.05, which defines the offense of gross sexual imposition. As relevant to Count Three of the indictment, R.C. 2907.02 provides:

> (A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:
>
> * * *
>
> (c) The other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age.

R.C. 2907.02(A)(1)(c).

{¶64} R.C. 2907.05 relates to Counts Four and Six and provides, in relevant part, as follows:

> (A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

\* \* \*

(5) The ability of the other person to resist or consent or the ability of one of the other persons to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the ability to resist or consent of the other person or of one of the other persons is substantially impaired because of a mental or physical condition or because of advanced age.

R.C. 2907.05(A)(5).

{¶65} R.C. 2907.02(A)(1)(c) and 2907.05(A)(5) each require a showing that, at the time of the offense, the victim's ability to resist or consent was substantially impaired because of a mental or physical condition or because of advanced age. "The phrase 'substantially impaired' is not defined by the Ohio Revised Code." *State v. Jones*, 12th Dist. Warren No. CA2021-04-038, 2021-Ohio-4117, ¶ 48. "[T]he Supreme Court of Ohio has found that 'substantial impairment' can be established 'by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct.'" *In re T.N.*, 3d Dist. Marion No. 9-15-36, 2016-Ohio-5774, ¶ 56, quoting *State v. Zeh*, 31 Ohio St.3d 99, 103-104 (1987). "[A] determination of substantial impairment is made 'on a case-by-case basis, providing great deference to the fact finder.'" *Id.*, quoting *State v. Brown*, 3d Dist. Marion No. 9-09-15, 2009-Ohio-5428, ¶ 22.

{¶66} As is clear from their language, R.C. 2907.02(A)(1)(c) and 2907.05(A)(5) require more than a bare showing that the victim's ability to resist or

consent was substantially impaired. Rather, these statutes require proof that the substantial impairment was caused by a "mental or physical condition" or "advanced age." *See State v. Horn*, 159 Ohio St.3d 539, 2020-Ohio-960, ¶ 11. "The General Assembly * * * has not defined 'mental or physical condition.'" *Id.* at ¶ 10. However, while the Supreme Court of Ohio similarly has not prescribed an exact definition for the phrase, it has defined "condition" as meaning "'[a] state resulting from a physical or mental illness'" or "'a usually defective state of health' or a prerequisite or restricting factor." *Id.* at ¶ 10, 12, quoting *Shorter Oxford English Dictionary* 483 (6th Ed.2007) and *Merriam-Webster's Collegiate Dictionary* 259 (11th Ed.2020). And although the phrase "advanced age" is not defined in R.C. 2907.02 or 2907.05, given the context, it should be given its ordinary meaning—"elderliness," "agedness," or "old age." *See The American Heritage Dictionary* 81 (2d Ed.1982) (defining "advanced" as "very old"); *Of advanced age/years*, https://www.merriam-webster.com/dictionary/of%20advanced%20age%2Fyears (accessed Mar. 28, 2022) (defining the idiom "of advanced age" as "having lived for many years: old").

### iii. The Indictment & the State's Theory of the Case

**{¶67}** York's sufficiency-of-the-evidence argument concerns only his convictions for Counts Three, Four, and Six. Therefore, we need only consider the indictment and the State's theory of the case as they relate to these three crimes.[1]

**{¶68}** Counts Four and Six of the indictment charged York with gross sexual imposition in violation of R.C. 2907.05(A)(5). However, contrary to the wording of the statute, Counts Four and Six did not allege that M.J.'s and B.J.'s abilities to resist or consent were substantially impaired because of "a mental or physical condition or because of advanced age," of which York was aware. Instead, the State alleged the ability of the girls to resist or consent was substantially impaired because of something the State labeled as "age of youth."

**{¶69}** "Age of youth" is not contained in R.C. 2907.05(A)(5) as an element of gross sexual imposition, nor is it defined by statute. Further, the State's "age of youth" theory was not precisely explained by the State at trial. However, we find some clarification in the State's closing statements. In its closing, the State argued:

> There's going to be the concept of substantial impairment. Substantial impairment, as you're going to go back and deliberate, will involve the difference in size between a six foot two, 215 pound man versus [M.J.] who is about five foot one, 135 pounds. Substantial impairment in this case also includes something very unique. Now, [York's counsel] said this family was dysfunctional. It's that dysfunction, the dynamic. A dynamic is something that is a force. A force that causes change or

---

[1] York's convictions for Count One (rape of M.J. in violation of R.C. 2907.02(A)(1)(b)) and Count Two (gross sexual imposition against M.J. in violation of R.C. 2907.05(A)(4)) will be addressed in our discussion of York's third assignment of error, below.

> causes something to progress as it is already on-going. The family dynamic experience [in the trailer] contributed to the opportunity, to the plan, to the motive, to the intent. The absence of mistake that [York] undertook so that he then could take advantage of [M.J.], [B.J.], and [K.A.]. The ability to resist became an issue.[2]

(Mar. 25, 2021 Tr. at 78). Later in its closing statements, the State said that York "used his physical size and dominance along with the family dynamic in order to execute his self-gratification." (Mar. 25, 2021 Tr. at 83). Furthermore, the State's closing statements contained numerous instances where the State connected substantial impairment to "the dynamics that have gone on in this family," Sheri's "own personal prurient interest towards drugs," and the "family dynamic that created a force that established a way of interacting between each other." (Mar. 25, 2021 Tr. at 87, 92). At one point, the State asserted that it was "the family dynamic that created substantial impairment." (Mar. 25, 2021 Tr. at 93).

{¶70} On appeal, the State has elaborated on its "age of youth" theory. In its appellate brief, the State explains that "the substantial impairment, which was both mental and physical, was the status of the victims as dependents—minor children—who by *age of youth* could not consent to [York's] sexual attacks nor could they resist, because even when B.J. ran to her parents * * *, the adults did nothing to protect the dependent children." (Emphasis sic.). The State refers to the "age of youth dynamic" as consisting of "the age of youth and the force that established the way of interacting

---

[2] This theory is more akin to a claim the offenses were committed by the use of force.

between B.J., K.A., and M.J. and their adult providers" as well as "the threats [York] and his family made." The State notes that other things, like "the neglectful parenting by [Sheri], * * * [York's] provision of rent money and drugs to [Sheri], and [York's] observed and perceived 'influence' upon [Sheri]," also contributed to the "age of youth dynamic." Finally, the State discusses "age of youth" as follows:

> [T]he prosecution presented evidence of a family "dynamic," a term more specific to describe the age of youth and the force that established the way of interaction between B.J., K.A. and M.J. vis-à-vis their adult providers which resulted in substantial impairment both mentally and physically. The prosecution focused upon the mala prohibita of the age and relationship dynamic that captured and contained B.J. and M.J. into a position of hopeless, helpless resignation of their plight, for which, a determination of substantial impairment was argued and made "on a case-by-case basis, providing great deference to the fact-finder."

{¶71} In contrast to Counts Four and Six of the indictment, Count Three of the indictment did not contain the "age of youth" language. Instead, Count Three of the indictment closely tracked the language of R.C. 2907.02(A)(1)(c) by alleging that M.J.'s ability "to resist or consent was substantially impaired because of a mental or physical condition or because of advanced age."

**iv. Insufficient evidence supports York's convictions on Counts Four and Six, but York's conviction on Count Three is supported by sufficient evidence.**

{¶72} With respect to Counts Four and Six of the indictment, the State bound itself to its "age of youth" theory by using that specific language to charge those offenses. Thus, in considering whether York's convictions on Counts Four and Six are supported by sufficient evidence, we limit our analysis to deciding whether the

State's "age of youth" theory supports those convictions. However, while the State attempted at trial to apply its "age of youth" theory to Count Three as well as to Counts Four and Six, the broader language of Count Three of the indictment allowed for proof of substantial impairment by means other than "age of youth." Accordingly, in determining whether York's conviction on Count Three is supported by sufficient evidence, we will consider whether the evidence supports that M.J. was substantially impaired by something other than "age of youth."

**a. York's convictions on Counts Four and Six are not supported by sufficient evidence because "age of youth," as formulated by the State, does not constitute a mental or physical condition capable of causing substantial impairment.**

{¶73} The State's "age of youth" theory is not a model of clarity. The State evidently regards "age of youth" as a kind of mental or physical condition defined by a complex of factors—including rampant drug use in the York family trailer, threats of violence, parental neglect, and Sheri and Jeff's knowing indifference to York's alleged abuse—that produced, or were symptomatic of, severe dysfunction in the familial relationship. It is apparently the State's contention that this dysfunction, when combined with M.J.'s and B.J.'s youthful ages and York's superior size and strength, exerted such influence on M.J. and B.J. as to render them powerless against York. This, in brief, is what the State seems to mean by "age of youth."

{¶74} However, in light of the Supreme Court of Ohio's recent decision in *State v. Horn*, "age of youth," at least as the State conceives of it, cannot support

convictions for gross sexual imposition in violation of R.C. 2907.05(A)(5) as charged in Counts Four and Six.[3] In *Horn*, the defendant was convicted of raping his stepdaughter and step-niece. On appeal to the Sixth District Court of Appeals, the defendant argued that two of his rape convictions should be reversed because there was insufficient evidence that the victims "were substantially impaired by a physical or mental condition pursuant to R.C. 2907.02(A)(1)(c)." *State v. Horn*, 6th Dist. Wood No. WD-16-053, 2018-Ohio-779, ¶ 52. The State countered by arguing that "the disparity of power in the familial relationship caused the substantial impairment." *Id.* at ¶ 53.

**{¶75}** With respect to the defendant's conviction for raping his stepdaughter, the Sixth District noted that the defendant's stepdaughter had "repeatedly testified how she felt helpless to stop the rape * * *." *Id.* at ¶ 59. The stepdaughter's testimony included statements such as, "'I felt if I didn't do [what he commanded], he was going to do it anyways,'" "'If I would disobey him, he would definitely start yelling [and I'd be afraid he would hurt me or my mother],'" and "'[I]f I told my mom she would have ended up asking him about it, he would have denied it, and she wouldn't believe me.'" *Id.* This testimony indicated that the stepdaughter "was afraid of [the defendant's] temper and was resigned to the helplessness of a child who expected no

---

[3] We note that *Horn* was decided by the Supreme Court over a year after the State obtained its indictment against York but a year before the case went to trial. In spite of the pronouncement in *Horn*, it does not appear the State modified its theory of the case in any fashion. Further, neither party relied on *Horn* in the trial court or in their arguments on appeal.

adult would believe her about what her step-father did to her." *Id.* Regarding the defendant's conviction for raping his step-niece, the Sixth District highlighted the step-niece's testimony that "[s]he felt she had no choice but to obey [the defendant] 'because he was family.'" *Id.* at ¶ 61. The Sixth District ultimately affirmed the defendant's convictions, concluding that the State had presented sufficient evidence from which the jury could conclude that the ability of the stepdaughter and step-niece to resist or consent was "substantially impaired because of a mental or physical condition of which appellant knew or should have known." *Id.* at ¶ 60, 62.

{¶76} The defendant then appealed the Sixth District's decision to the Supreme Court of Ohio. In its decision, the Supreme Court noted that the counts of rape had been affirmed on the basis that the defendant's "familial relationship" with his stepdaughter and step-niece had resulted in substantial impairment. 159 Ohio St.3d 539, 2020-Ohio-960, at ¶ 4. The court observed that "a familial relationship may be considered to prove rape by force," and it emphasized previous decisions holding that "in a situation involving a parent-child relationship and a rape allegation, '[f]orce need not be overt and physically brutal, but can be subtle and psychological.'" *Id.* at ¶ 8, quoting *State v. Eskridge*, 38 Ohio St.3d 56, 58 (1988). However, the issue was whether a familial relationship is a "mental or physical condition," not whether the facts supported a theory of rape by force, and the court "conclude[d], without prescribing exact definitions for either 'familial relationship' or 'mental or physical

condition,' that a familial relationship is not a mental or physical condition" within the meaning of R.C. 2907.02(A)(1)(c). *Id.* at ¶ 8, 12. Therefore, the court reversed the Sixth District's judgment "to the extent that the judgment was based on [the defendant's] familial relationship with [his stepdaughter and step-niece]."[4] *Id.* at ¶ 13.

{¶77} In this case, the State's "age of youth" theory is much like, if not the same as, the "familial relationship" theory rejected by the Supreme Court of Ohio in *Horn*. Indeed, the State at times plainly argued that it was the "family dynamic" that caused M.J.'s and B.J.'s substantial impairment. Like the "familial relationship" in *Horn*, "age of youth" is not something that affected M.J. and B.J. independently— that is, something suffered by the victims without reference to their home life. *See id.* at ¶ 10. Instead, "age of youth" existed only by reference to the dysfunctional family dynamic and to M.J.'s and B.J.'s relationships with York, Sheri, Jeff, and other family members within the context of that dynamic. *See id.* As it was clear to the court in *Horn* that a "familial relationship" is not a "mental or physical condition," it is equally clear to us that "age of youth" as used by the State in this case is not a "mental or physical condition." *See id.* at ¶ 11. Therefore, under the particular facts of this case, the State cannot prove beyond a reasonable doubt that York violated R.C.

---

[4] The defendant's rape conviction relating to his stepdaughter was reversed in its entirety, but because the Sixth District had found an alternative basis to support the rape conviction relating to the defendant's step-niece, the case was remanded for the Sixth District to consider whether the alternative basis was sufficient to support the conviction. *Horn* at ¶ 13.

2907.05(A)(5) based on its theory that "age of youth" was the condition that caused M.J.'s and B.J.'s substantial impairment. *Id.* at ¶ 12. Accordingly, we conclude that insufficient evidence supports York's convictions on Counts Four and Six. While the evidence of the physical and psychological forces brought to bear on M.J. and B.J. might have supported a prosecution for gross sexual imposition by force, the State opted not to indict York under that theory. *See id.* at ¶ 8.

**b. York's conviction on Count Three is supported by sufficient evidence because the State presented evidence supporting a finding that M.J. was sleeping when York engaged in sexual conduct with her.**

{¶78} As explained above, in determining whether sufficient evidence supports York's conviction on Count Three, we may consider whether the State presented evidence that M.J. was substantially impaired by something other than "age of youth." After review, we find that the State did present such evidence.

{¶79} In M.J.'s video-recorded forensic interview at the CAC, which was admitted as evidence in York's trial, M.J. described an incident that happened when she was approximately 15 years old. During that incident, she was sleeping on the couch in the family trailer when she awoke to York laying on top of her. Shortly after she awoke, York got off of her. M.J. then observed York pull up his boxer shorts. M.J.'s underwear was pulled down around her ankles, and she felt pain in her vagina.

{¶80} Construing this evidence in a light most favorable to the prosecution, we conclude that York's conviction on Count Three is supported by sufficient evidence.

From M.J.'s statements, it is clear that she was asleep when the incident began. "[T]he courts of appeals have 'concluded that sleeping is a "physical condition" that substantially impairs a victim's ability to resist for purposes of rape in violation of R.C. 2907.02(A)(1)(c).'" *State v. Stevens*, 3d Dist. Allen No. 1-14-58, 2016-Ohio-446, ¶ 13, quoting *State v. Wine*, 3d Dist. Auglaize No. 2-12-01, 2012-Ohio-2837, ¶ 50. Moreover, a jury can reasonably conclude that the defendant knew the victim was substantially impaired if evidence is presented that the victim was sleeping. *See State v. Anderson*, 6th Dist. Wood No. WD-04-035, 2005-Ohio-534, ¶ 41. Thus, on this evidence, a reasonable jury could conclude both that M.J.'s ability to resist was substantially impaired by a physical condition at the time of this incident and that York knew that M.J.'s ability to resist was substantially impaired.

**{¶81}** Furthermore, M.J.'s statements support a reasonable inference that York engaged in sexual conduct, specifically vaginal intercourse, with M.J. during this incident. During the interview, M.J. did not explicitly say that York had penetrated her vagina. Nonetheless, from the circumstances described by M.J.—York laying on top of M.J., York putting his boxer shorts back on after getting off of M.J., M.J.'s underwear being around her ankles, and M.J.'s experience of vaginal pain—it can be rationally inferred that York inserted his penis into M.J.'s vagina during this incident. *See State v. Gawron*, 7th Dist. Belmont No. 20 BE 0009, 2021-Ohio-3634, ¶ 81 (concluding that where a video showed the defendant pushing the victim's head

toward the defendant's lap, fellatio could be inferred from the movements depicted in the video even though the video did not specifically show sexual conduct). Finally, it is undisputed that M.J. is not, and was not, York's spouse. Accordingly, we conclude that sufficient evidence supports York's conviction for rape in violation of R.C. 2907.02(A)(1)(c) as charged in Count Three of the indictment.

{¶82} York's second assignment of error is sustained in part and overruled in part.

**D. Third Assignment of Error: Are York's convictions on Counts One, Two, and Three against the manifest weight of the evidence?**

{¶83} In his third assignment of error, York argues that his convictions are against the manifest weight of the evidence.

**i. Standard for Manifest-Weight-of-the-Evidence Review**

{¶84} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[] the evidence and all reasonable inferences, consider[] the credibility of witnesses and determine[] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses.

*State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

**ii. York's convictions on Counts One, Two, and Three are not against the manifest weight of the evidence.**

{¶85} In addition to the convictions discussed under York's second assignment of error, York was convicted of one count of rape in violation of R.C. 2907.02(A)(1)(b) (Count One) and one count of gross sexual imposition in violation of R.C. 2907.05(A)(4) (Count Two). R.C. 2907.02(A)(1)(b) and 2907.05(A)(4) prohibit engaging in sexual conduct or sexual contact, respectively, with another who is not the spouse of the offender when the other person is less than thirteen years of age, whether or not the offender knows the age of the other person. Given our resolution of York's second assignment of error, the question before us is limited to whether York's convictions on Counts One and Two, as well as York's conviction for rape in violation of R.C. 2907.02(A)(1)(c) as charged in Count Three, are against the weight of the evidence.

{¶86} Each of these convictions relates to abuse allegedly perpetrated by York against M.J. In arguing that these convictions are against the manifest weight of the evidence, York simply maintains that M.J. was not a credible witness. He specifically

-46-

notes testimony from Sheri and Jeff that M.J. had a history of being dishonest, that her story changed over time, that he was rarely alone with M.J., and that he was not even residing in the home during the time frame of some of the alleged abuse. York contends that in light of these credibility issues and the "absence of any objective or forensic evidence," the "evidence weighed strongly in favor of acquittal."

{¶87} "When there is a conflict in the testimony of witnesses, it is for the trier of fact to determine the weight and credibility to be given to such evidence." *State v. Robinson*, 12th Dist. Butler No. CA2018-08-163, 2019-Ohio-3144, ¶ 29. The jury may "take note of any inconsistencies in the testimony and resolve them accordingly, believing all, part, or none of each witness's testimony." *State v. Lark*, 12th Dist. Fayette No. CA2018-03-004, 2018-Ohio-4940, ¶ 29. Ultimately, "'a conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version.'" *State v. Smith*, 3d Dist. Marion No. 9-20-50, 2021-Ohio-3404, ¶ 26, quoting *State v. Ferrell*, 10th Dist. Franklin No. 19AP-816, 2020-Ohio-6879, ¶ 59.

{¶88} In this case, York's trial counsel thoroughly attacked M.J.'s credibility, as well as the credibility of many of the State's other witnesses. Through cross-examination of Sheri and Jeff, as well as through the testimony of D.J. and Simpson, the jury was provided with many potential bases upon which to discount M.J.'s allegations and accept York's claim that, if the abuse occurred at all, it was perpetrated

by M.J.'s maternal grandfather. The fact that the jury chose to believe M.J. despite York's attempts to discredit her does not render York's convictions against the manifest weight of the evidence.

**{¶89}** York's third assignment of error is overruled.

**E. Sixth Assignment of Error: Did York receive ineffective assistance of counsel?**

**{¶90}** In his sixth assignment of error, York argues that he received ineffective assistance of counsel. In support of his argument, York points to no fewer than 11 examples of his trial counsel's supposed ineffectiveness.

**i. Ineffective-Assistance-of-Counsel Standard**

**{¶91}** "In criminal proceedings, a defendant has the right to effective assistance of counsel under both the United States and Ohio Constitutions." *State v. Evick*, 12th Dist. Clinton No. CA2019-05-010, 2020-Ohio-3072, ¶ 45. A defendant asserting a claim of ineffective assistance of counsel must establish: (1) counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689. Counsel is entitled to a

-48-

strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance of counsel. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989).

**{¶92}** Prejudice results when "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bradley* at 142, quoting *Strickland* at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Strickland* at 694.

**ii. York failed to establish that he received ineffective assistance of counsel.**

**{¶93}** Initially, we note that many of York's ineffective-assistance-of-counsel arguments have been mooted or effectively determined through our resolution of his other assignments of error. For example, York argues that his indictment was defective with respect to Counts Four and Six and that his trial counsel was ineffective for failing to move to dismiss those counts. However, having concluded that the State did not present sufficient evidence to support York's convictions on Counts Four and Six, we need not consider his trial counsel's effectiveness in this regard. Similarly, York maintains that his trial counsel was ineffective for failing to object to testimony

about his alleged drug use, drug sales, and suicide attempt, but by concluding that the trial court did not commit plain error by allowing the State to elicit testimony on these topics, we have preempted these arguments.

**{¶94}** Furthermore, to the extent that viable claims of ineffective assistance of counsel might remain, we can quickly dispose of them. After listing various instances of his trial counsel's purportedly deficient performance in his appellate brief, York states that, but for this deficient performance, he "would not have been unfairly prejudiced by the jury's exposure to irrelevant, inadmissible, and highly prejudicial" evidence. He then declares that "[i]t is unquestionable that the outcome of [his] trial would have been different but for trial counsel's deficient performance." To sustain a claim of ineffective assistance of counsel, the defendant is required to affirmatively establish prejudice. *State v. Hill*, 4th Dist. Athens No. 16CA3, 2018-Ohio-67, ¶ 43. Bare claims of prejudice or "[c]onclusory statements that the outcome would have been different, without more, are not enough to carry a defendant's burden on the issue of prejudice." *State v. Williams*, 1st Dist. Hamilton No. C-180588, 2020-Ohio-1368, ¶ 22. As York has done little more than baldly assert prejudice, he has failed to carry his burden on this issue. Accordingly, we conclude that York has not demonstrated that he received ineffective assistance of counsel.

**{¶95}** York's sixth assignment of error is overruled.

## F. First Assignment of Error: Were Counts Four and Six of the indictment fatally defective?

**{¶96}** In his first assignment of error, York argues that Counts Four and Six of the indictment are void because the indictment failed to include all essential elements of the crimes charged. However, through our previous conclusion that York's convictions on Counts Four and Six are not supported by sufficient evidence, York's first assignment of error has been rendered moot, and we will not address it. App.R. 12(A)(1)(c); *see State v. Gideon*, 165 Ohio St.3d 156, 2020-Ohio-6961, ¶ 26 ("[A]n assignment of error is moot when an appellant presents issues that are no longer live as a result of some other decision rendered by the appellate court.").

## IV. Conclusion

**{¶97}** For the foregoing reasons, we find the first assignment of error to be moot and find no error prejudicial to York with respect to his third, fourth, fifth, and sixth assignments of error. However, having found error prejudicial to York with respect to his second assignment of error, that assignment of error is sustained in part (as it relates to Counts Four and Six) and overruled in part (as it relates to Count Three). Consequently, we reverse the judgment of the Union County Court of Common Pleas with respect to York's convictions on Counts Four and Six and remand for further

proceedings consistent with this opinion.  In all other respects, we affirm.

*Judgment Affirmed in Part,*
*Reversed in Part, and*
*Cause Remanded*

**ZIMMERMAN, P.J. and SHAW, J., concur.**

**/jlr**