[Cite as *State v. Carnes*, 2025-Ohio-1409.]

# IN THE COURT OF APPEALS OF OHIO
# THIRD APPELLATE DISTRICT
# CRAWFORD COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

TIMOTHY CARNES,

    DEFENDANT-APPELLANT.

CASE NO. 3-24-06

OPINION AND
JUDGMENT ENTRY

Appeal from Crawford County Common Pleas Court
Trial Court No. 23-CR-0301

Judgment Affirmed

Date of Decision: April 21, 2025

APPEARANCES:

    *William T. Cramer* for Appellant

    *Daniel J. Stanley* for Appellee

**WALDICK, P.J.**

{¶1} Pursuant to App.R. 26, we have granted reconsideration of the appeal of defendant-appellant, Timothy Carnes ("Carnes"). In this Court's initial opinion, *State v. Carnes*, 2025-Ohio-427 (3d Dist.), we indicated as part of our review of the second assignment of error that we had no access to the victim's medical records because they were not admitted into evidence. However, the victim's unadmitted medical records were "held" by the trial court, but they were not included with the record transmitted to this Court on appeal with the admitted exhibits. Therefore, in the interest of justice, we granted Carnes's motion to reconsider his appeal after a full review of the record. We therefore vacate the prior opinion and issue the following opinion.

{¶2} Carnes brings this appeal from the February 20, 2024 judgment of the Crawford County Common Pleas Court sentencing him to prison after a jury found him guilty of Felonious Assault. On appeal, Carnes argues that improper character evidence was introduced at trial, that the trial court abused its discretion by refusing to admit medical records into evidence, that Carnes received ineffective assistance of counsel, and that the cumulative errors deprived him of a fair trial. For the reasons that follow, we affirm the judgment of the trial court.

*Background*

**{¶3}** In October of 2023, Carnes and his wife, Tiffany, were separated and living apart. However, Carnes and Tiffany still regularly communicated and were, to some degree, attempting to repair their relationship.

**{¶4}** Both Carnes and Tiffany were occasional drug users. On October 6, 2023, Tiffany indicated to Carnes through text messages that she could get methamphetamines and Carnes told her to do so. Carnes and Tiffany also discussed having amorous relations that evening.

**{¶5}** Tiffany arrived at Carnes's residence sometime after 10 p.m. on October 6, 2023. When Tiffany arrived, Carnes was in his detached garage with several friends. Tiffany and Carnes went inside the residence to Carnes's bedroom on the first floor. At the time they went into the bedroom, a young adult named Hunter was relaxing on the living room couch on the first floor.

**{¶6}** Tiffany and Carnes got into an argument in the bedroom. Their stories diverged from that point. Tiffany testified that the argument got heated and Carnes said "I'll fucking kill you bitch[.]" (Tr. at 227). Tiffany testified that Carnes threw her across the bed, into the walls and into a closet. She testified that Carnes picked her up out of the closet and threw her into a small safe. Tiffany testified that she blacked out during some portions of the altercation. Tiffany testified that Carnes would not let her leave.

{¶7} Hunter testified that he overheard Carnes yelling at Tiffany and telling her to get back in the bedroom because "she wasn't allowed to leave." (Tr. at 360). Hunter testified that Carnes threatened to kill Hunter and everybody else in the house if anyone called the police.

{¶8} Hunter testified that there were two dogs in the house that were getting loud due to the altercation. Hunter waited for a brief break in the argument and asked if he could let the dogs out. When Hunter let the dogs out he tried to leave the door open so Tiffany could leave but Carnes shut the door.

{¶9} Hunter returned to the living room and eventually heard a "bang" from the kitchen. He went and looked and saw Tiffany on the ground hunched over. Hunter testified that Carnes was leaning over Tiffany, apparently checking on her. Hunter testified that he did not have a good view of Tiffany to see if she had any injuries.

{¶10} Tiffany claimed that Carnes had pushed her into a wall in the kitchen, which knocked her down. Tiffany testified that she had glasses on at the time and that her glasses broke from the impact, opening a gash on her face that left a scar.

{¶11} Shortly after the incident in the kitchen, Tiffany left the house, yelling at Carnes. She threatened to call the police on Carnes and his friends for their drug use. Others in the detached garage heard Tiffany yelling as she left.

{¶12} Tiffany called her friend on the way home and indicated that Carnes had assaulted her. Tiffany's friend, Kristy, was staying with Tiffany at the time.

Tiffany arrived home around 2:30 a.m. with a gash on her face and numerous bruises. Kristy took photographs of the injuries, which included the large facial gash and significant bruising to an eye.

{¶13} Tiffany initially did not want to go to the police, but she ultimately agreed and went to the Bucyrus Police Department around 7:30 a.m. At the police department, Tiffany was incoherent so she was transferred to the hospital. Tiffany testified that as a result of the incident, she had a broken foot, a sprained foot, and a brain bleed. She also had some bruising on her neck that was speculated to be the result of strangulation, though Tiffany did not recall being strangled.

{¶14} Carnes testified in his own defense indicating that while he had shoved Tiffany on the night in question, he did so only after she ripped his shirt when she grabbed him. He also testified that he did not push Tiffany hard and he did not push her into anything.

{¶15} Carnes testified that Tiffany had balance problems. Tiffany had acknowledged as much in her own testimony. Carnes testified that Tiffany had fallen in the shower only six weeks prior and injured her head, which he felt was the cause of any head injury she had. Carnes testified that Tiffany did not look like she did in Kristy's pictures when she left his house. He speculated she had done something to try and get him in trouble as she had threatened.

{¶16} On October 10, 2023, Carnes was indicted for Felonious Assault in violation of R.C. 2903.11(A)(1), a second degree felony, Strangulation in violation

of R.C. 2903.18(B)(1), a second degree felony, Aggravated Menacing in violation of R.C. 2903.21(A), a first degree misdemeanor, and Unlawful Restraint in violation of R.C. 2905.03(A), a third degree misdemeanor. The two misdemeanor charges were dismissed by the State prior to the commencement of trial.

{¶17} Carnes proceeded to a jury trial wherein the jury found Carnes guilty of Felonious Assault, but acquitted him of the Strangulation charge. On February 20, 2024, Carnes was sentenced to serve an indefinite prison term of 7 to 10.5 years. It is from this judgment that Carnes appeals, asserting the following assignments of error for our review.

**First Assignment of Error**

**Appellant was deprived of his constitutional right to due process and a fair trial when the trial court abused its discretion by permitting the prosecution to use character evidence in violation of Evid.R. 404.**

**Second Assignment of Error**

**Appellant was deprived of his constitutional right to due process and a fair trial when the trial court abused its discretion by excluding medical records in violation of Evid.R. 901.**

**Third Assignment of Error**

**Appellant was deprived of his constitutional right to the effective assistance of counsel when defense counsel admitted into evidence several text messages that were highly prejudicial to appellant.**

**Fourth Assignment of Error**

**Appellant was deprived of his constitutional right to due process and a fair trial by the cumulative effect of the errors in this case.**

{¶18} For ease of discussion, we elect to address some of the assignments of error out of the order in which they were raised.

*Second Assignment of Error*

{¶19} In his second assignment of error, Carnes argues that the trial court abused its discretion by excluding medical records of the victim. Specifically, he argues that the parties agreed that the records were authentic at a pretrial hearing, and that the records should have been admissible even in the absence of any testimony from medical personnel.

Standard of Review

{¶20} The admission or exclusion of evidence rests within the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173 (1987). "We will not reverse a trial court's ruling on evidentiary issues absent an abuse of discretion and proof of material prejudice." *State v. McKelton*, 2016-Ohio-5735, ¶ 181.

Analysis

{¶21} Before the trial, during the trial, and at the conclusion of the trial, there were discussions regarding introducing Tiffany's medical records into evidence.

Tiffany's medical records were contained on a CD and consisted of 1019 PDF pages. The records covered dates from January 26, 2020, to January 24, 2024.

**{¶22}** Prior to trial the parties discussed the medical records with the trial court in the following exchange.

> THE COURT: There is also some medical records that [defense counsel] wants to use. I think they are the same records the State has. Again, could be used, I assume, only when the Defendant's alleged, excuse me, victim is on the stand, possibly someplace else, but the bottom line is when those are used I'll rule on them on a case by case basis.
>
> The parties have acknowledged that these – and that was at a prior pretrial that these are authentic records[1], but they have not waived the right to object for various reasons, mainly hearsay is not really going to be an issue because they are medical records but mainly relevancy.
>
> * * *
>
> [I]f [defense counsel] wants to use [the records] with a witness, he is going to say this is a document I want to use. He is going to show it to [the prosecutor]. He is going to show it to me. If there is no objection he will use the document. If there is an objection then I'll rule on the objection.
>
> * * *
>
> I'm not just going to let somebody put, hey, here is the CD with all the medical records in, all right. That – that is not the impetus of the way it is supposed to be done. All right. Show me what it is you want to admit. Give them a chance to object. I'll look at it. I'll either say yes it is coming in or yeah, it is not.

---

[1] There is no transcript from the prior pretrial hearing.

I'm not going to say here is 900 * * * pages of medical records. I want to put them in. Well, the State has got to have a chance to object to them and I have got to look at them.

(Tr. at 10-12). The trial court thus outlined a clear procedure for the parties to use in an attempt to provide the jury with only relevant medical records.

{¶23} Defense counsel asked Tiffany about her medical history during cross-examination, particularly Tiffany's hospital stay on August 27, 2023, approximately six weeks before the alleged incident herein. Tiffany testified that on the August date, she fell and hit her head, resulting in a concussion. She testified she had poor balance and that she often "stumble[s]." (Tr. at 276).

{¶24} While defense counsel cross-examined Tiffany, defense counsel attempted to ask about the medical records from October 7, 2023, wherein the record apparently stated Tiffany was not "in distress" while at the hospital. The prosecution objected, stating that "in distress" was a medical "term of art" and Tiffany was not a medical professional. The trial court paused to review the medical records and stated, "I looked at some other stuff in there that I think are medical terms, but some of them aren't. So I am going to have to deal with them one by one." (Tr. at 258-259). The trial court allowed defense counsel to ask Tiffany whether she was "in distress" or in pain while at the hospital, but Tiffany responded she remembered nothing from being at the Bucyrus hospital on October 7, 2023.

{¶25} Cross-examination proceeded and defense counsel asked if Tiffany understood that she had been diagnosed with a "temporal arachnoid cyst." (Tr. at 265). Tiffany said she was born with the cyst on her brain. She also testified that she had been in the hospital in the past for migraines. Defense counsel then wanted to ask how many times Tiffany had been hospitalized for brain-related injuries over the last two years and the prosecution objected. The trial court again had the jury step out to discuss the evidentiary issues.

{¶26} The trial court asked defense counsel what he was getting at with the medical records, and defense counsel stated he wanted to talk about the August 27 fall, but the trial court indicated that had already been covered. Defense counsel then stated he wanted to talk about an incident where Tiffany had a "perforated nasal septum," stating "we are all aware how you get a perforated nasal septum." (Tr. at 268). The trial court stated that you could get a perforated nasal septum by having your nose busted and defense counsel was not going to insinuate "she has cocaine in a septum because you can get it from a bust in the nose too." (Tr. at 269). The trial court did, however, allow defense counsel to continue to ask about the August 27 incident, Tiffany's history with migraines, and her balance issues.

{¶27} Notably, the State did not present the testimony of any medical professionals, relying instead on lay testimony to establish serious physical harm. The defense similarly did not present any testimony from medical professionals.

{¶28} After the presentation of evidence was complete, there was another discussion about the medical records. Defense counsel stated that he had four years of medical records with a "certificate of authenticity from Avita. You already said you won't let them in. But [the State was] going to call Dr. Didden. I was going to ask him are these the records and the certificate, but they [never called the doctor as a witness]." (Tr. at 493). The trial court excluded the medical records stating "no foundation has been laid. No medical doctor to testify. I don't understand why it happens, but it happens." (Tr. at 496). Thus the records were excluded.

{¶29} Carnes argues on appeal that the trial court erred by excluding the medical records. He frames the issue as the trial court committing an error because the records had already been authenticated per agreement of the parties at an earlier pretrial hearing. He claims that under Evid.R. 901(A), the requirement of authentication or identification as a condition precedent to admissibility is a low threshold that was met here. However, Carnes's argument ignores the trial court's other statements about the medical records needing to be specific and have relevance to the case before they were going to the jury.

{¶30} First, we emphasize that we find no abuse of discretion with the trial court's finding that the defense never established the relevance of the bulk of the records. In fact, some records were clearly irrelevant, and prejudicial to the State, such as the issue of the victim's "perforated nasal septum."

{¶31} The records also contained contained a copy of the Tiffany's "suicide note" that appeared to address Carnes's "anger problem." In fact, roughly 750 pages of the records related to an incident in 2021 wherein Tiffany was hospitalized for a suicide attempt that she claimed was the result of "having a hard time at home" and being "overwhelmed with her husband and financial issues." Tiffany apparently attempted to overdose on multiple medications. The records are replete with information that has not been shown to be relevant to the case. Thus we can find no abuse of discretion for the trial court denying the introduction of the CD of the medical records into evidence when the vast majority of the records held no relevance whatsoever.

{¶32} However, even assuming that the trial court should have admitted some of the records, particularly those used in cross-examination (if redacted versions of the medical records had been offered), we could find no prejudice here because the information in the medical records that was relevant to the case was directly used to cross-examine the victim. Thus any error in excluding the medical records would be harmless. For example, Carnes claims that "[t]he medical records from Tiffany's August 2023 fall and hospital visit indicate that Tiffany said she fell coming out of the bathroom, and that she was having balance issues that are not new for her. The records also note that Tiffany had a history of headaches and a temporal arachnoid cyst." (Appt.'s Br. at 18). All of these facts were directly covered by defense counsel in cross-examination and the information was presented to the jury.

Ohio courts have "not hesitated to find that error is harmless where the excluded evidence is merely cumulative to other compelling evidence." *State v. West*, 2006-Ohio-6259, ¶ 9 (10th Dist.); *State v. Rivera*, 2023-Ohio-1788, ¶ 51 (9th Dist.). Thus even if there was any error here, it was harmless.

**{¶33}** For all of these reasons, Carnes's second assignment of error is overruled.

*First Assignment of Error*

**{¶34}** In his first assignment of error, Carnes argues that the trial court erred by permitting the prosecutor to introduce improper other acts/character evidence in violation of Evid.R. 404.

Relevant Authority

**{¶35}** "Evid.R. 404(B) categorically prohibits evidence of a defendant's other acts when its only value is to show that the defendant has the character or propensity to commit a crime." *State v. Smith*, 2020-Ohio-4441, ¶ 36. "[E]vidence which tends to show that the accused has committed other crimes or acts independent of the crime for which he stands trial is not admissible to prove a defendant's character or that the defendant acted in conformity therewith." *State v. Hawthorne*, 2005-Ohio-6779, ¶ 24 (7th Dist.). However, under Evid.R. 404(B), the admission of "other acts" extrinsic to the charged offense is permissible under certain circumstances. *State v. York*, 2022-Ohio-1626, ¶ 38 (3d Dist.).

**{¶36}** When determining whether other acts evidence is admissible, courts engage in a three-step analysis. *See State v. Williams*, 2012-Ohio-5695, ¶ 19-24. First, the court "consider[s] whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Id.* at ¶ 20, citing Evid.R. 401. "The threshold question is whether the evidence is relevant." *Smith* at ¶ 37. However,

> the problem with other-acts evidence is rarely that it is irrelevant; often, it is too relevant. In the Evid.R. 404(B) context, the relevance examination asks whether the proffered evidence is relevant to the particular purpose for which it is offered, as well as whether it is relevant to an issue that is actually in dispute.

(Citations omitted.) *Id.*; *see State v. Hartman*, 2020-Ohio-4440, ¶ 26 ("[T]he inquiry is not whether the other-acts evidence is relevant to the ultimate determination of guilt. Rather, the court must evaluate whether the evidence is relevant *to the particular purpose* for which it is offered.") (Emphasis sic.). "Thus, courts should begin by evaluating whether the evidence is relevant to a non-character-based issue that is material to the case." *Smith* at ¶ 38.

**{¶37}** In the second step, the court "consider[s] whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)." *Williams*

at ¶ 20. Under Evid.R. 404(B), other-acts evidence may be admissible to establish "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B)'s list of permissible uses for other-acts evidence is non-exhaustive. *Hartman* at ¶ 26. The key to the admissibility of other-acts evidence under Evid.R. 404(B) is that "the evidence must prove something other than the defendant's disposition to commit certain acts." *Id.* at ¶ 22.

**{¶38}** In the third and final step, the court "consider[s] whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice." *Williams* at ¶ 20, citing Evid.R. 403. "As the importance of the factual dispute for which the evidence is offered to the resolution of the case increases, the probative value of the evidence also increases and the risk of *unfair* prejudice decreases." (Emphasis sic.) *Hartman* at ¶ 31.

**{¶39}** The first two steps of the foregoing analysis present questions of law and are subject to a de novo standard of review on appeal. *York* at ¶ 42. However, the third step constitutes a judgment call which we review for an abuse of discretion. *Id*.

**{¶40}** Finally, we note that Carnes did not object to the admission of all of the purported instances of "other-acts" evidence that are the subject of this assignment of error. With respect to the evidence to which Carnes did not object, we are limited to plain-error review. *York* at ¶ 43. To reverse a criminal conviction

-15-

on the basis of plain error, the trial court must have deviated from a legal rule, the error must have been an obvious defect in the proceeding, and the error must have affected a substantial right. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Under the plain-error standard, the appellant must demonstrate that the outcome of his trial would clearly have been different but for the trial court's errors. *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996). We recognize plain error with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

Analysis

{¶41} In his brief, Carnes lists numerous instances where he claims improper 404(B) evidence was introduced. We will address each instance in turn.

{¶42} First, Carnes argues that the trial court erred by permitting Tiffany to testify that Carnes "has anger problems." (Tr. at 226). During Tiffany's testimony, she testified that Carnes was yelling at her in the bedroom and she was not yelling back because she "already kn[e]w what it [wa]s." (*Id*. at 225). She clarified that Carnes was yelling at her, that he had anger problems, so she knew it was going to be an argument. Defense counsel did not object to this statement, thus we review the matter for plain error.

{¶43} Under a plain error standard, witnesses testified to the volatility of both Tiffany and Carnes. The evidence indicated that both Tiffany and Carnes

regularly used vulgar language towards each other, including on the night in question both in text and in person. Tiffany and Carnes were also estranged in their relationship due to Tiffany cheating, so the jury was able to balance Tiffany's "anger problems" comment with the surrounding circumstances.

{¶44} Moreover, Carnes's anger and his lack of control could point to the absence of mistake or lack of accident, which are permissible uses under Evid.R. 404(B), particularly given that Carnes was claiming that Tiffany fell on her own in the kitchen and that any head injury she had was from a prior fall, not from him pushing her down. As Carnes has not shown that the evidence is inadmissible and he has shown no prejudice, we do not find plain error with regard to this instance.

{¶45} Next, Carnes argues that the trial court erred by permitting Tiffany's daughter to testify that Tiffany's injury in August of 2023 was the result of Carnes pushing Tiffany. "I guess he had pushed her," Tiffany's daughter testified. (Tr. at 381). Carnes did object to this testimony and the trial court overruled the objection, so we review it under a harmless error standard.

{¶46} Tiffany's daughter testified that her mother had regular head injuries. When Tiffany's daughter was interviewed by police, she stated that her mother had a "chronic subdural hematoma." However, Tiffany's daughter testified that she did not know what that meant and she only got that phrase from a text from her grandmother, who was a nurse. She also testified that Tiffany had a tumor that she was born with.

**{¶47}** Tiffany's daughter was asked about Tiffany's fall in August of 2023 and she testified that she thought there had been an altercation between Tiffany and Carnes wherein Carnes pushed Tiffany. However, Tiffany herself testified about the August 2023 incident and she indicated she had just lost her balance and fell.

**{¶48}** After reviewing the record, we can find no error with the trial court's determination. Although Tiffany implied that there had been another act in the past similar to the one in the case *sub judice*, that was already specifically clarified by Tiffany herself. Moreover, the evidence could again be admissible to show lack of accident or intent, which are permissible uses under Evid.R. 404(B). Furthermore, even if we found error here, we could not find that it had any impact on the trial due to the scar on Tiffany's face and her broken foot both being evidence of serious physical harm separate from a head injury. Therefore Carnes's argument is not well-taken.

**{¶49}** Carnes next argues that the trial court erred by permitting into evidence "prejudicial" text messages that Carnes had sent, including one where he stated "I never wanted to have to shove you." Importantly, the State and defense counsel both specifically stipulated to the introduction of all text messages between Carnes and Tiffany in the week prior to the incident. The text messages were vulgar and displayed a relationship filled with rage, drugs, and sex. Both individuals presented poorly.

{¶50} Regardless, we fail to see how it was error for the trial court to permit the introduction of evidence that both parties wanted the jury to see. Moreover, the evidence tends to show the absence of accident or mistake, which are permissible uses of 404(B) evidence. Thus Carnes's argument is not well-taken.

{¶51} Carnes next argues that the trial court erred by permitting the presentation of multiple jail house calls that Carnes had made. Carnes objected to the calls being played on relevance grounds and the trial court removed the jury to address the objection. The trial court ruled as follows:

> All right. Gentlemen, these are my thoughts, okay. Any nasty thing he says about the alleged victim in this case I think is relevant. The FU with the C word is relevant. Anything he says about me it is completely irrelevant. I could care less what he says about me. Everybody at the jail is allowed to say bad things about me. And I don't think that should be played.
>
> * * *
>
> [I]t is an admission by a party opponent. It is clearly an excited utterance and I do believe it is relevant basically to show the attitude of the Defendant towards the alleged victim in this particular case.

(Tr. at 391, 393). The calls were then played to the jury in segments, removing what the trial court found to be irrelevant and prejudicial. The jury was also instructed not to consider any comments Carnes made about the trial judge or the court system.

{¶52} After reviewing the record, we find no abuse of discretion with the trial court's analysis. Carnes has not demonstrated that the jail calls were

-19-

inadmissible or that the trial court abused its discretion by admitting segments of them. Therefore, this argument is not well-taken.

**{¶53}** Lastly, Carnes argues that the "improper" character evidence that was introduced was compounded during the prosecutor's cross-examination of Carnes. During cross-examination, the prosecutor asked questions such as: "Would you agree with me that those text messages, those jail calls, the statements that you made that you get pretty angry when you don't get something that you want?" (Tr. at 470). Carnes responded, "[T]o an extent, but at the same time I was also put in jail for something I didn't do." (*Id.*) The prosecutor also asked Carnes if he belittled, threatened, and manipulated people when Carnes did not get what he wanted and Carnes responded, "No."

**{¶54}** Carnes's credibility was directly in question given that he was arguing that either Tiffany's injuries were the result of her falling on accident, or she wrecked her car, or she injured herself in some way. Carnes does not show how the prosecutor's questions were inadmissible. Even if he did, Carnes's actual answers were not prejudicial to his defense.

**{¶55}** In sum, Carnes baldly argues that there were numerous pieces of evidence that were improperly introduced in violation of Evid.R. 404(B). He does not develop his arguments in his brief to show how the evidence does not fit in any of the permissible categories under Evid.R. 404 and he provides no case authority

showing that the trial court's rulings were erroneous. For all of these reasons, his first assignment of error is overruled.

*Third Assignment of Error*

**{¶56}** In his third assignment of error, Carnes argues that he received ineffective assistance of trial counsel.

Standard of Review

**{¶57}** "[I]n Ohio, a properly licensed attorney is presumed competent." *State v. Gondor*, 2006-Ohio-6679, ¶ 62. To prove ineffective assistance of counsel, a defendant must establish that: (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's performance is deficient if it falls below an objective standard of reasonable representation. *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. Prejudice exists if there is "a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different." *State v. Sowell*, 2016-Ohio-8025, ¶ 138.

Analysis

**{¶58}** Carnes argues that his trial counsel was ineffective for permitting the introduction into evidence of text messages from his phone from the week prior to the incident in question. He argues that the text messages made him look bad, even

though a detective testified that the text messages showed that Carnes and Tiffany were equally vulgar and cruel to each other. Carnes contends that absent the text messages, there was a reasonable probability of a better outcome.

{¶59} Carnes's arguments ignore the fact that he was acquitted of the Strangulation charge. Defense counsel crafted a strategy largely based around two drug users getting into a late night argument when a stumble-prone victim fell and was injured. Defense counsel attacked Tiffany's credibility repeatedly, and the text messages were a key part of that attack. Moreover, the text messages form the immediate background of the offense, and illustrate the relationship between Carnes and Tiffany. *See York* at ¶ 57.

{¶60} After a full review of the record, we do not find deficient performance by Carnes's trial counsel, and we do not find that the outcome of the trial would have been different if the text messages were not introduced into evidence. Therefore, Carnes's third assignment of error is overruled.

*Fourth Assignment of Error*

{¶61} In his fourth assignment of error, Carnes argues that he was deprived of a fair trial by the cumulative effect of the "errors" in his trial.

{¶62} Under the cumulative-error doctrine, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually

constitute cause for reversal. *State v. Spencer*, 2015-Ohio-52, ¶ 83 (3d Dist.). "To find cumulative error, a court must first find *multiple* errors committed at trial and determine that there is a reasonable probability that the outcome below would have been different but for the combination of the harmless errors." (Emphasis added.) *In re J.M.*, 2012-Ohio-1467, ¶ 36 (3d Dist.).

**{¶63}** Here, we have not found multiple errors in this case, thus the cumulative error doctrine does not apply. *State v. Robertson*, 2023-Ohio-2200, ¶ 84 (3d Dist.). Therefore, Carnes's fourth assignment of error is overruled.

*Conclusion*

**{¶64}** Having found no error prejudicial to Carnes in the particulars assigned and argued, his assignments of error are overruled and the judgment of the Crawford County Common Pleas Court is affirmed.

*Judgment Affirmed*

**ZIMMERMAN and MILLER, J.J., concur.**

Case No. 3-24-06

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

Juergen A. Waldick, Judge

William R. Zimmerman, Judge

Mark C. Miller, Judge

DATED:
/jlm

-24-